■ NETTA POCCHIA et al., Respondents, v FARAJOLAH MOTAHEDEH, Appellant, et al., Defendants.—In an action to recover damages for personal injuries, etc., based on negligence and medical malpractice, the defendant Farajolah Motahedeh appeals from a judgment of the Supreme Court, Kings County (Morton, J.), dated August 2, 1984, which, after a jury trial, is in favor of the plaintiff Netta Pocchia in the principal amount of $350,000, and in favor of the plaintiff John Pocchia in the principal amount of $10,000.

Judgment reversed, on the law, the facts, and in the exercise of discretion, and new trial granted.

Although this action originally involved a number of claims of malpractice against several physicians, physicians' groups, and the Methodist Hospital, by the end of the plaintiffs' case the only remaining defendant was Dr. Farajolah Motahedeh, and the sole claim of medical malpractice presented to the jury concerned the timeliness of the performance of an abdominal hysterectomy upon the injured plaintiff, Netta Pocchia (hereinafter the plaintiff), two days after she had undergone a dilation and curettage procedure. There is no issue as to whether a hysterectomy was indicated or whether, other than its timeliness, the surgery was performed correctly.

In June 1978 the plaintiff consulted the defendant Dr. Motahedeh, a gynecologist, regarding a pain which she had been experiencing in her lower right side for a number of years. On July 4, 1978, after a physical examination disclosed a "questionable mass" in the area of her right ovary and fallopian tube and a sonogram revealed a fibroid tumor on her uterus, Dr. Motahedeh admitted the plaintiff into the Methodist Hospital for a dilation and curettage procedure, and a possible laparotomy or total abdominal hysterectomy. The dilation and curettage procedure, which was performed on July 5, revealed no abnormalities. Subsequently, Dr. Motahedeh scheduled the plaintiff for an exploratory laparotomy on July 7. Upon performing the laparotomy, Dr. Motahedeh discovered, inter alia, that the plaintiff's left ovary was cystic, that adhesions had attached her colon to ligaments connected to that ovary, and that her uterus was enlarged. As a consequence of his discovery, Dr. Motahedeh proceeded to perform a total abdominal hysterectomy. Notably, at the time of the

surgery, the plaintiff, an admitted heavy smoker, had an extensive history of cardiopulmonary difficulties dating back to at least 1962, which included treatment for recurrent chronic bronchitis, asthma, angina and chronic obstructive lung disease. As a result of the plaintiff's medical history of cardiac and pulmonary difficulties, Dr. Motahedeh, prior to the surgery, had the plaintiff examined by one of his colleagues, Dr. J. D. Patel, a specialist in pulmonary medicine, to determine if surgery was contraindicated. Dr. Patel examined the plaintiff on July 5, following the dilation and curettage procedure, and after performing a number of tests, cleared her for surgery. On July 9, two days after the surgery was performed by Dr. Motahedeh, the plaintiff suffered a collapsed lung which required her placement in intensive care for five days. Thereafter, following her release from the hospital, she continued to suffer more severe cardiac and pulmonary difficulties than she had previously experienced.

In June 1980, the plaintiff commenced this action naming Drs. Motahedeh, Patel and Eustaquio Ferreiro (the anesthesiologist), Park Slope Anesthesia Associates, P. C., and the Methodist Hospital as the defendants. She claimed, *inter alia,* that as a result of the decision to perform surgery only two days after she had undergone the dilation and curettage procedure, her chronic cardiac and pulmonary conditions had been aggravated. As previously noted, by the end of the trial, as a result, *inter alia,* of a settlement reached with Dr. Patel and the dismissal of the action as against the hospital, Dr. Motahedeh was the only remaining defendant, and the jury rendered a verdict in favor of the plaintiff Netta Pocchia in the principal amount of $350,000, and in favor of the plaintiff John Pocchia in the principal amount of $10,000.

Upon review of the entire record, we conclude that the jury's finding that Dr. Motahedeh's conduct was a departure from accepted medical standards, which caused an aggravation of the plaintiff's preexisting cardiac and pulmonary conditions, was against the weight of the evidence, and, accordingly, we grant a new trial.

The plaintiff's principal expert witness, Dr. Albert Schwartz, a specialist in obstetrics and gynecology, testified primarily to the effect that, in his opinion, a hysterectomy was not indicated in this case. He did concede, however, that it was performed properly. As previously noted, the decision to perform the hysterectomy is not in issue in this case. The only issue is the timing of the surgery and, therefore, to the extent that Dr. Schwartz's testimony was not addressed to that issue,

it was irrelevant. When Dr. Schwartz stated at one point that in his opinion the surgery was performed too soon after the dilation and curettage procedure, he added the comment, "particularly from an anesthetic point of view". The action, as noted, however, had been discontinued against the anesthesiologist, and Dr. Schwartz did not at that point refer to any specific departure from accepted medical practice by Dr. Motahedeh. At another point, Dr. Schwartz testified that "the timing of the operation probably caused her [the plaintiff's] stormy postoperative course; namely, difficulty in breathing and coughing", but cited this as a cause of an incisional hernia that the plaintiff suffered, not as a cause of an aggravation of her preexisting cardiac and pulmonary conditions. The trial court specifically ruled that the incisional hernia was not to be considered part of the plaintiff's claimed damages. Further, while Dr. Schwartz stated that the plaintiff's pulmonary problems increased after the surgery, he admitted that he had never reviewed her medical history regarding treatment for this condition for the five years prior to the surgery.

The plaintiff also called Dr. Paul Dichter, an osteopath, as a witness, Dr. Dichter had been treating the plaintiff for her cardiopulmonary condition for many years. In addition to testifying regarding the plaintiff's medical condition both prior and subsequent to the surgery, he voiced his opinion that her admission to the hospital contributed to an increase in her anxiety and a worsening of her pulmonary and cardiac conditions. He did not express an opinion as to whether the timing of the surgery was a cause of this aggravation of the preexisting conditions. He did state that the plaintiff was an anxious person, which often affected her pulmonary problems. When Dr. Dichter conducted a physical examination of the plaintiff about one month after the surgery, the results were normal, except that the plaintiff complained of anxiety as a result of her experience in the hospital. During a further examination three to four months after the surgery, Dr. Dichter found no change in the plaintiff's breathing compared to what it was prior to her admission to the hospital. He also conceded, with regard to the indications of chronic obstructive lung disease, which he found in an X ray taken on the day of her discharge from the hospital, that he had diagnosed that condition over two years prior to her admission to the hospital. Other portions of Dr. Dichter's testimony reveal that during the period following the surgery, when the plaintiff's condition was worsening, she had failed to take the prescribed medication, continued to smoke, failed to see a pulmonary specialist to whom

he had referred her, and failed to visit him on a regular basis for checkups.

The plaintiff's other expert, Dr. Nathaniel Reich, an internist and cardiologist, testified in general as to what departures occurred in the treatment of the plaintiff during her stay in Methodist Hospital. After the plaintiff rested, however, the court ruled that Dr. Reich's testimony be stricken except for those portions which specifically referred to departures by Dr. Motahedeh. It appears, however, that Dr. Reich did not refer to any specific departures on the part of Dr. Motahedeh.

Dr. Motahedeh produced his own experts who testified that he had acted in accordance with accepted medical standards.

Based upon an examination of all of the evidence, we conclude that a fair interpretation thereof fails to support a finding that Dr. Motahedeh's decision to proceed with the surgery after the plaintiff had been cleared for surgery by Dr. Patel constituted a departure from accepted medical standards on his part or that the aggravation of the plaintiff's preexisting medical condition was specifically attributable to the timing of the operation. Therefore, the verdict was against the weight of the evidence, and a new trial is required *(see, Cohen v Hallmark Cards,* 45 NY2d 493; *Nicastro v Park,* 113 AD2d 129).* Mangano, J. P., Thompson, Brown and Weinstein, JJ., concur.