■ Rosa Fellin et al., Appellants-Respondents, v Vivek Sahgal et al., Respondents-Appellants. [745 NYS2d 565] —In an action to recover damages for medical malpractice, etc., the plaintiffs appeal, as limited by their brief, from so much of an order of the Supreme Court, Kings County (Spodek, J.), dated February 13, 2001, as granted those branches of the defendants' motion which were to set aside the verdict, to dismiss the cause of action relating to the giving of medications, and for a new trial on the cause of action relating to delayed diagnosis and treatment, and the defendants cross-appeal from so much of the same order as denied that branch of their motion which was to dismiss the cause of action relating to delayed diagnosis and treatment.

Ordered that the order is modified by deleting the provision

thereof granting that branch of the defendants' motion which was to dismiss the cause of action relating to the giving of medications; as so modified, the order is affirmed insofar as appealed and cross-appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Kings County, for a new trial.

This medical malpractice action arose on January 31, 1991, when David Fellin (hereinafter the plaintiff), who worked as an elevator repairman for Long Island College Hospital (hereinafter LICH), suddenly experienced pain in his back. At 11:40 A.M. that day, the plaintiff walked into LICH's emergency room and complained that he felt pressure on his back. The plaintiff, then age 23, was otherwise a healthy man who had no prior medical history. At 12:30 P.M., the plaintiff's vital signs were taken and were normal, including a blood pressure reading of 130/90. At about 1:00 P.M., the plaintiff reported that the back pain had subsided, but he felt "a lot of headache" and he had vomited. At 1:30 P.M., the plaintiff's vital signs and blood pressure were still essentially normal. Nevertheless, he continued to experience a lot of pain in his head and the vomiting had not ceased. At approximately 2:00 P.M., the defendant Dr. Vivek Sahgal conducted a gross neurological exam of the plaintiff. This exam revealed that the plaintiff was alert and oriented, that both pupils were equally reactive, and that he had normal movement in his extremities. At this time the plaintiff's blood pressure remained within normal limits, but he continued to complain of back pain radiating up to his head. As a result, Sahgal ordered a CAT scan to be performed on the plaintiff.

At approximately 2:45 to 3:00 P.M., before the CAT scan test could be done, the plaintiff's blood pressure spiked to an unacceptably high level, and he suddenly deteriorated into a comatose state. Ultimately, brain surgery was performed to save the plaintiff's life. He survived, but remains in a chronic debilitated state. It was thereafter determined that prior to 11:40 A.M. the plaintiff suffered an initial bleed (subarachnoid hemorrhage) from an aneurysm located in his right middle cerebral artery, and at 3:00 P.M. the aneurysm ruptured completely, thereby discharging a massive amount of blood into the brain. The blood and resulting pressure caused a shift and herniation of the plaintiff's brain stem.

Following a trial, the jury was asked to consider two theories of liability: (1) whether LICH committed malpractice by failing to obtain a timely CAT scan and operate immediately without obtaining further testing, and (2) whether Sahgal and/or LICH committed malpractice by not giving any medications to reduce

the plaintiff's blood pressure prior to 3:00 P.M. The jury returned a verdict in favor of the plaintiffs on both issues, and awarded substantial damages.

Upon the defendants' post-verdict motion, inter alia, to set aside the verdict, the Supreme Court determined that there was legally sufficient evidence to support the jury verdict on the issue of delayed treatment, but that it was against the weight of the evidence. Thus, the court set aside the verdict on that cause of action and ordered a new trial. As for the issue of giving medications to lower the plaintiff's blood pressure, the Supreme Court granted that branch of the defendants' motion which was to dismiss that cause of action, finding that there was legally insufficient evidence to support the jury's determination.

We disagree with the Supreme Court to the extent that it concluded there was legally insufficient evidence to support the conclusion that the defendants were liable for their failure to administer medication (specifically, the drug "mannitol") at some point before the plaintiff experienced a catastrophic brain aneurysm. To conclude as a matter of law that a jury verdict is not supported by sufficient evidence, there must be "no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Nicastro v Park,* 113 AD2d 129, 132; *see Cohen v Hallmark Cards,* 45 NY2d 493, 499). In this case, there was a valid line of reasoning by which one could conclude that the defendants' failure to administer Mannitol during the relevant period constituted a departure from good and accepted medical practice. The plaintiffs' expert, Dr. Lawrence Shields, specifically testified that Mannitol should have been administered to the plaintiff at an early stage to reduce intracranical pressure. In Shields' opinion, this medication, along with certain other non-medicinal efforts, would have "bought some additional time." It is this additional time or "window of opportunity" which was crucial since it could have allowed the pre-operative procedures to have been completed without concomitantly running an inordinate risk of severe neurological impairment.

On the other hand, the defendants' expert opined that Mannitol was contraindicated because during the relevant time period, the plaintiff was awake, not confused, and his pupils were equal in size, all of which indicated that he did not have a "mass inside [his] head that's on the verge of ruining [him] or taking [his] life." Most significantly, the defense maintained that Mannitol should not be given where, as here, the patient's

blood pressure readings were within normal parameters. In any event, the fact that there was disagreement between Shields and the defense experts regarding the propriety and/or efficacy of administering Mannitol is not a basis upon which to conclude that the evidence on this issue was legally insufficient (*see generally Gonzalez v Lok K. Cheng,* 287 AD2d 595, *lv denied* 97 NY2d 613; *Halkias v Otolaryngology-Facial Plastic Surgery Assoc.,* 282 AD2d 650).

However, the determination that the defendants committed malpractice by not administering Mannitol was against the weight of the evidence. A jury verdict should be set aside as against the weight of the evidence where "the jury could not have reached the verdict on any fair interpretation of the evidence" (*Nicastro v Park,* 113 AD2d 129, 134; *Delgado v Board of Educ.,* 65 AD2d 547, *affd* 48 NY2d 643). Setting aside a jury verdict as against the weight of the evidence "requires a discretionary balancing of many factors" (*Nicastro v Park, supra* at 133). Moreover, as we noted in *Nicastro* (at 136): "[t]hat discretion is at its broadest when it appears that the unsuccessful litigant's evidentiary position was particularly strong compared to that of the victor. At that point, the question is whether the result the jury reached is so contrary to the conclusion that might fairly have been reached on the basis of the evidence that the court should exercise its power to overturn the jury's determination."

Here, the defendants adduced ample evidence to demonstrate that the failure to administer Mannitol did not constitute malpractice. The majority of proof indicated that Mannitol was contraindicated in this case based upon the fact that the plaintiff's blood pressure readings were all within normal limits. Furthermore, even the plaintiff's expert conceded that Mannitol's blood pressure-reducing properties could have led to "dire consequences" for the plaintiff. In short, the defendants' evidentiary position on this issue was so "particularly strong" as compared to that of the plaintiff that the jury determination does not comport with a fair interpretation of the evidence adduced (*see Nicastro v Park, supra* at 136). Therefore, a new trial is warranted.

Regarding the issue of delayed treatment, we agree with the Supreme Court that there was legally sufficient evidence to support the jury verdict, but that it was against the weight of the evidence. In this regard, there was a valid line of reasoning by which one could conclude that the defendants departed from good and accepted medical practice by failing to timely treat the plaintiff. For example, the evidence suggests that the

defendants actually did very little to assess and/or treat the plaintiff's condition from the time he first appeared at the emergency room until almost four hours later, when his situation rapidly deteriorated into a life-threatening scenario. Nevertheless, given that the plaintiff's vital signs were normal throughout most of the period in question, there was also considerable evidence to indicate that the defendants' "wait and see" attitude was reasonable and proper.

Moreover, even assuming that the delay in treatment was a departure from good and accepted medical practice, the evidence further suggests that the departure may not have been the proximate cause of the plaintiff's injuries. It must be noted that the plaintiff required brain surgery, a process which requires extensive preparation time and one which should not be undertaken without considerable caution. In other words, there may simply not have been sufficient time to prepare the plaintiff and perform the necessary surgery before he experienced his second and catastrophic brain aneurysm. We note that even after the plaintiff's condition became acute, it still took almost 2½ hours before actual surgery could begin.

Accordingly, given that the evidence regarding the alleged delay in treatment so preponderated in the defendants' favor, the court providently exercised its discretion in setting aside the jury's verdict on that issue and ordering a new trial (*see Cohen v Hallmark Cards, supra*).

In light of this determination, we need not address the issue of damages. Santucci, J.P., S. Miller, Krausman and Goldstein, JJ., concur.