■ SEONG SIL KIM et al., Respondents, v NEW YORK CITY TRANSIT AUTHORITY, Appellant. [812 NYS2d 485]—

Judgment, Supreme Court, New York County (Carol E. Huff, J.), entered November 20, 2003, incorporating an order which denied defendant's posttrial motion to set aside the jury verdict, apportionment of liability and award of damages thereon, and to order a new trial, reversed, on the law, without costs, the jury verdict vacated and the complaint dismissed. The Clerk is directed to enter judgment accordingly.

On May 3, 2000, at 9:19 P.M., defendant New York City Transit Authority (NYCTA) received a call relayed by a 911 operator from a person who had been a passenger on a southbound A train. This passenger claimed to have seen a person on the southbound local tracks at 34th Street and 8th Avenue. However, he did not call 911 until arriving at an unidentified station in Brooklyn where he exited the train. Assuming that he

called from the first stop in Brooklyn, a minimum of 18 minutes would have elapsed from the time he saw the person on the tracks to the time he made the 911 call. During that time period, no less than three trains had entered the 34th Street local tunnel prior to the one which plaintiff claims struck her.

Defendant's Transit Command promptly warned its train operators in the vicinity of 34th Street to proceed with "caution." This is a term of art that requires train operators to reduce their speed and make visible observations of the tracks, tunnel and surrounding area to ensure that these areas are clear.

An E train had just departed from the 42nd Street station heading southbound toward Brooklyn on the local tracks when its operator received the "caution" warning. He slowed down from the posted speed limit of 25 miles per hour (mph) to approximately 10 to 15 mph. Although a preceding train operator reported nothing suspicious in the tunnel on the "A" or local track, the E train operator continued to proceed with "caution," scanning the dark tunnel, pillars, catwalk and surrounding area as the train continued southbound. Ultimately, the train operator saw Seong Sil Kim (plaintiff), her arms at her side, lying on the track bed between the rails, her head facing the train. He immediately swung the control lever, placing the train into emergency mode so it would come to a quick stop.

The operator's estimate of the distance between plaintiff and the train when he first saw her varied. At his deposition, he testified that she was 80 to 120 feet away, but at trial he testified that 50 to 70 feet may be more accurate. It is undisputed that plaintiff was approximately 100 feet into the tunnel and that 50 feet of the train passed over her before it came to a complete stop.

Several hours after the accident, a road car inspector employed by defendant scrutinized the undercarriage of the train for evidence of blood, body marks, scratches or anything else that might indicate that the train came into contact with a person. He found nothing to indicate such contact, explaining at trial that subway car undercarriages are full of grease, easily revealing any marks. He further testified that each train is equipped with a trip device that puts the train into an emergency stop mode when it hits something, as well as a "snow block," which consists of a piece of wood that falls off the train if it hits something. Neither of these devices showed any evidence that the train struck anything, nor was there any evidence that the devices were not in proper working order.

The jury returned a substantial verdict in favor of plaintiffs and apportioned liability 70%-30% against defendant.

Defendant moved to set aside the verdict, for a new trial or, in the alternative, for a reduction in the award of damages. It argued, inter alia, that plaintiff failed to establish it was negligent under the circumstances; that a previous train may have struck plaintiff before the issuance of the warning, and hence, there was no proximate cause; that plaintiff intentionally entered the tracks and the court's failure to charge assumption of the risk was reversible error; that the apportionment of liability was against the weight of the evidence; and that the damage award was excessive. The IAS court denied the motion.

This was a tragic accident. It is also one for which there is insufficient objective evidence to sustain a plaintiff's verdict. Virtually the only evidence plaintiffs presented on liability was the testimony of an "expert," a Mr. Bellizzi. He opined that the appropriate warning for this unconfirmed sighting should not have been "caution" but "extreme caution," i.e., operating the train at a speed no greater than 10 mph. However, his conclusion was speculative and not supported by anything in the record. When asked why traveling in excess of 10 mph was a violation of safety procedure, his response was merely "it is for safety." He did not state where or how his standard for safe operating procedure was derived. So also, he used a series of charts purportedly showing stopping distances for miles per hour, but with no support, other than to back up his own conclusion as to why they were appropriate. His responses to the hypotheticals regarding the 10 mph limit were cases where a workman is seen standing with a reflective vest or where there is a *confirmed* sighting of someone in the tunnel—not, as in this case, where the sighting was unconfirmed. Even the train conductor agreed that 10 mph is reasonable where the sighting is confirmed. Plaintiffs presented no evidence regarding an industry standard or why defendant's policy of proceeding with "caution" as opposed to "extreme caution" was not appropriate under the circumstances.[1]

In short, plaintiffs failed to show that the train operator, who followed the warning order he received, acted negligently. Further, the evidence does not support plaintiffs' alternative theories of liability that the train was traveling too fast, or that an attentive motorman should have seen plaintiff sooner.[2]

Finally and most significantly, even if, as our colleague in the

---

1.  In fact, at one point plaintiffs argued the train should have shut down when an unconfirmed sighting is raised—an untenable standard for the transit system to follow.

2.  In fact, ordinarily the Transit Authority may have been entitled to the protection of qualified immunity (*see DeLeon v New York City Tr. Auth.*, 305

dissent argues, there was a rational basis to accept Mr. Bellizzi's opinion, it is immaterial because there is no evidence that the train in question actually struck plaintiff. There is nothing in the record which indicates how long plaintiff was on the track bed prior to being spotted by the passenger who called 911. She could have been there for hours.[3] At least three trains passed over the track bed where she was found after the "caution" warning was issued, but there is no indication of how many trains may have passed over those same tracks before that or before she was first spotted. The only proof was that she was in a "trough" between the tracks and the train stopped over her. After a detailed examination, the undercarriage inspection of the train in question failed to show any evidence that she was actually struck by that train. The claim that this train struck her is therefore pure speculation.

The only proof of liability plaintiff offered was wholly conclusory expert testimony, unsupported by any factual basis to show the necessary relationship between the injuries and the train in question. Plaintiffs failed to establish that defendant was negligent or, if negligent, that its negligence was the proximate cause of these injuries.

In view of the foregoing, it is unnecessary to address defendant's other claims of error. Concur—Friedman, J.P., Nardelli, Williams and Sweeny, JJ.

Gonzalez, J., dissents in a memorandum as follows: This is an appeal by defendant New York City Transit Authority (TA) from a $5 million reduced judgment in favor of plaintiffs and from Supreme Court's partial grant of the TA's posttrial motion to set aside the judgment or reduce the damage award solely to the extent of reducing the damages for past and future pain and suffering. The majority holds that the conclusory testimony of plaintiffs' expert witness was legally insufficient to demonstrate the negligence of the TA and its train operator and that the jury's finding of proximate cause was based on speculation. Accordingly, the majority determines that judgment should be entered dismissing the complaint.

Because a rational jury could have found that the TA's negligence was a proximate cause of the plaintiff Seong Sil Kim's injuries, I respectfully dissent and would affirm the judg-

AD2d 227 [2003]; *Saborido-Calvo v New York City Tr. Auth.*, 11 AD3d 216 [2004]) which could be extended to this case. However, this issue was not preserved and in any event, need not be addressed for the resolution of this appeal.

3. Plaintiff testified at trial that she had no memory of the events in question.

ment and Supreme Court's rulings on the posttrial motion, with one exception. That exception would be to modify the judgment solely to the extent of vacating the jury's verdict on liability apportionment and remanding for a new trial on apportionment only, unless plaintiffs stipulate to a reapportionment of 70% to plaintiff Seong Sil Kim (hereinafter plaintiff) and 30% to the TA.

The TA's argument that no evidence exists that its train operator acted negligently is refuted by the trial record. During his questioning of the train operator, plaintiffs' counsel established that the operator received a warning of a person on the track six minutes prior to the accident, and that one TA document identified the warning given as "restricted speed, extreme caution," which requires train operators to drive 10 mph or less and be able to stop within half their field of visibility. The operator also admitted that he had testified to at least three different distances at which he first observed plaintiff on the tracks, ultimately settling on 50 to 70 feet. In addition, he testified that his field of visibility was 60 feet at the time of the accident and that his reaction time in stopping this particular train was "a second or so."

The operator further acknowledged that if he knew an unauthorized person was on the tracks, he should not go faster than 10 miles per hour (mph). In fact, he claimed he was trying to keep the train under that speed on the day of the accident, but he was actually going between 10 and 15 mph. Finally, the operator admitted that he was attempting to drive the train at a speed that would permit him to stop it within half of his field of visibility, and that it would not be safe operating procedure to drive at a faster speed.

Plaintiffs also called an expert witness who was asked to assume the facts testified to by the operator, and then to apply those facts to a stopping distance chart that was introduced into evidence. Plaintiffs' expert explained the formula used in the chart, and then applied the formula to each of the four distances testified to by the train operator. In each case, the expert concluded that, assuming a speed of 10 mph and a one second reaction time, the train should have stopped before going over plaintiff with respect to each distance. Ultimately, the expert gave his opinion that driving the train at more than 10 mph was a violation of safe operating procedure and that it was unsafe to travel at a speed that would prevent stopping within half his field of visibility. The expert also noted that this train clearly did not stop within the operator's field of visibility.

The majority discredits the conclusions of plaintiffs' expert on

the grounds that he did not state how his standard for safe operating procedure was derived and he did not introduce any evidence of an industry standard. I disagree. On cross-examination, the train operator admitted that since 10 mph was an appropriate speed for track workers with reflective vests, it likewise would be appropriate for unauthorized or vulnerable persons on the tracks, if he knew they were there. Plaintiffs' expert gave his opinion that the "extreme caution" warning was appropriate under the assumed facts given to him, and that the operator was negligent in not slowing the train to 10 mph. Notably, the TA did not challenge the existence or source of the "extreme caution" standard; it simply argued that it was inapplicable to unconfirmed reports of a person on the tracks. In my view, the jury was entitled to accept plaintiffs' argument that the extreme caution standard was applicable in this situation and that the operator's excessive speed constituted a failure to exercise reasonable care.

In addition, plaintiffs' expert confirmed that safe operating procedure under these circumstances required a speed in which the train could be stopped within half the operator's field of visibility. Since the train operator had testified that his field of visibility was 60 feet, and the undisputed evidence showed that the train traveled at least 110 feet from the time he stopped the train, there was credible evidence in the record supporting plaintiffs' expert's opinion that the train was traveling too fast under the circumstances.

The TA's arguments contradicting plaintiffs' expert do not render plaintiffs' evidence conclusory or speculative. Thus, although the TA's expert testified that the reaction time could be as much as two seconds, and plaintiffs' expert conceded as much, the jury was entitled to accept the train operator's testimony that his reaction time in this instance was "a second or so." Similarly, although the TA's expert testified that the mere caution warning was appropriate and that the operator acted in conformity with that warning, that is simply one side of the argument that the jury was not required to accept (see Stevens v New York City Tr. Auth., 19 AD3d 583, 585 [2005] [resolution of factual dispute raised by parties' experts was for jury]).

I further agree with Supreme Court's rejection of the TA's proximate cause arguments. Although the TA introduced forensic evidence in support of its claim that the subject train did not strike plaintiff, the jury had sufficient evidence to conclude otherwise. The fact that the train operator observed plaintiff on the tracks in front of his moving train, and emergency personnel subsequently removed her from underneath that train with

severe injuries, justified the jury's inference that this particular train, and not two earlier trains, had struck her. In addition, while the TA contended that plaintiff's apparent suicide attempt was the sole proximate cause of the accident, there was no direct evidence, given her amnesia, as to exactly how plaintiff ended up on the subway tracks. Further, plaintiffs introduced evidence demonstrating that even if her presence on the tracks was deliberate, the train would have stopped had the operator been driving 10 mph or less. These questions were matters for the jury to decide, and there was no basis to hold as a matter of law that plaintiff's own conduct constituted the sole proximate cause of her injuries.

A court may grant judgment notwithstanding the verdict to the losing party only where "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]), and a verdict may be set aside as against the weight of the evidence only where "the jury could not have reached its verdict on any fair interpretation of the evidence" (*McDermott v Coffee Beanery, Ltd.*, 9 AD3d 195, 206 [2004]; *see Nicastro v Park*, 113 AD2d 129, 134-135 [1985]). In my view, the jury's findings of negligence and proximate cause in this case were based on the evidence in the record and may not be disturbed under either of these standards.

However, I do find that the jury's verdict on apportionment was against the weight of the credible evidence. Although the TA did not raise this argument in its posttrial motion, this Court has the power to review and correct manifest jury error. The evidence overwhelmingly demonstrated that plaintiff was suffering from postpartum depression and that her presence on the tracks was the result of a suicide attempt. While plaintiff and her family, at times, denied that she was depressed, their statements to the police and in their trial testimony indicated otherwise. On this record, the jury's apportionment of 30% fault to plaintiff can only be interpreted one way—the jury accepted that plaintiff attempted to commit suicide by deliberately walking onto the subway tracks. The jury having reached this conclusion, their apportionment of 70% fault to the TA could not have been reached on any fair interpretation of the evidence. While the train operator may have acted negligently by driving too fast, the record also shows that he acted promptly in slowing down and attempting to stop the train as soon as he observed plaintiff. Thus, while in legal terms the accident may have been avoidable, the jury's apportionment is illogical and

must be set aside. I would modify and remand for a new trial on apportionment only unless plaintiffs stipulate to a liability reapportionment of 30% to the TA and 70% to plaintiff (*Pouso v City of New* York, 22 AD3d 395, 396-397 [2005]; *Roseboro v New York City Tr. Auth.,* 10 AD3d 524 [2004]; *Nares v M & W Waterproofing,* 5 AD3d 155, 156-157 [2004], *lv dismissed* 3 NY3d 698 [2004]).

Finally, I reject the TA's argument that the court erred in giving a *Noseworthy* charge to the jury (*see Noseworthy v City of New York,* 298 NY 76 [1948]). The medical testimony established that plaintiff suffered amnesia as a result of the accident and the facts further show that the train operator had superior knowledge as to the cause of the accident.